# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-60007

United States Court of Appeals
Fifth Circuit

**FILED**

May 11, 2015

Lyle W. Cayce
Clerk

DOCTOR SCOTT KLINGLER,

Plaintiff–Appellant,

v.

UNIVERSITY OF SOUTHERN MISSISSIPPI, USM; DOCTOR MARTHA
SAUNDERS, Individually and Officially; DOCTOR ROBERT LYMAN,
Individually and Officially,

Defendants–Appellees.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 2:12-CV-150

Before JOLLY, HIGGINBOTHAM, and OWEN, Circuit Judges.

PER CURIAM:*

Dr. Scott Klingler was a tenure-track professor at the University of
Southern Mississippi (USM). USM placed Klingler on administrative leave
after comments he allegedly made raised concerns of campus safety. After
USM declined to renew his annual contract, Klingler sued USM and certain
university officials under 42 U.S.C. § 1983, alleging deprivations of due process

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH
CIR. R. 47.5.4.

No. 14-60007

and equal protection. He also asserts various Mississippi contract and tort law claims. The district court granted USM's motion for summary judgment on all of Klingler's claims, and we now affirm.

## I

USM retained Klingler as an Assistant Professor at USM's School of Library and Information Science (SLIS). USM entered into one-year contracts with tenure-track professors that, according to USM's Faculty Handbook (Handbook), "are renewable entirely at the discretion of the Board." At the time of the events giving rise to this suit, Klingler's contract would terminate in May 2012 unless renewed by USM.

For the fall 2010 semester, Klingler taught an online course that included a chat component; he and his students could type their discussion of the course topics from their personal computers. Klingler, as the course instructor, could appear "logged out" to the students while still monitoring the class's discussion. During one chat session, Klingler expressed his disappointment in the students' lack of preparation and ended the session early. After Klingler logged out, but while he was still reading the chat transcript, some students questioned whether Klingler's reprimand was actually a joke. One student replied, "he's a joke."

The following morning, November 9, 2010, Klingler asked Shane Hand, a graduate assistant, to review the chat transcript. Hand told Klingler that he believed the student who called Klingler a joke acted inappropriately. Klingler and Hand have provided different accounts as to how Klingler replied. Hand reported that Klingler then said, "I have never shot a student and what that girl said does not bother me, but I think about it and I think about it a lot." Klingler denies making this statement and testified at his deposition that he said, "I've never shot anybody for not giving feedback—or words to that effect," and then only after Klingler and Hand further discussed the previous night's

No. 14-60007

class did Klingler say, "I've thought about it; I've thought about it a lot." Klingler maintains, "[t]hey were two completely distinct statements. It was feedback." Hand promptly reported Klingler's statement.

That afternoon, a meeting was held by several USM officials at which Hand was questioned. Hand explained that Klingler's statements troubled him because Klingler had also exhibited other strange behaviors that day, such as sitting uncomfortably close to a female graduate assistant and using profane language. The officials decided to remove Klingler from campus immediately and place him on paid administrative leave pending further investigation. He was banned from campus and from initiating contact with students or faculty.

While on leave, Klingler sent messages through Facebook stating that he had "been wrongfully accused by a Graduate Assistant" and "was placed on paid administrative leave." The messages asked his former students to contact USM on his behalf. Klingler also posted to Facebook the letter he received from the dean of SLIS placing him on administrative leave, Hand's statement to the USM police, and a mock "mug shot" of himself holding a placard with numbers and the letters "USM UPD." There is also evidence that while a former graduate student was visiting her mother while in a hospital, Klingler heard the student's voice, saw her mother's name on the hospital room door, and entered to talk to the former student. Klingler told her that he was on administrative leave and was not permitted to speak with students. This unexpected encounter was unsettling to the former graduate student, and she contacted a USM official about it.

In February 2011, USM informed Klingler that his contract would not be renewed upon its expiration in May 2012. USM also limited Klingler's remaining employment activities to academic research. Klingler was instructed that he was still not permitted to appear on campus or initiate contact with any USM students, staff, or faculty. Klingler filed a formal

3

No. 14-60007

grievance with USM pursuant to Chapter 12 of the Handbook. The Handbook provides four levels of institutional review. Klingler's grievance was considered and denied at every level.

He then filed suit against USM, Dr. Martha Saunders (the President of USM), and Dr. Robert Lyman (the Provost of USM) in Mississippi state court. He sought damages under 42 U.S.C. § 1983 asserting that his rights to due process and equal protection had been violated, and he alleged state law claims of intentional infliction of emotional distress, negligent infliction of emotional distress, breach of express contract, and breach of implied contract.

USM removed the action to the United States District Court for the Southern District of Mississippi. The district court granted summary judgment to the defendants on all of Klingler's claims. Klingler now appeals to this court.

## II

We review a district court's "grant of summary judgment *de novo*, applying the same standards as the district court."[1] Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[3] We consider the "evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party."[4]

---

[1] *Burnett Ranches, Ltd. v. United States*, 753 F.3d 143, 146 (5th Cir. 2014).

[2] FED. R. CIV. P. 56(a).

[3] *Bluebonnet Hotel Ventures v. Wells Fargo Bank*, 754 F.3d 272, 276 (5th Cir. 2014) (internal quotation marks and citations omitted).

[4] *Id.*

4

No. 14-60007

## III

Klingler seeks damages under § 1983 against USM and from Lyman and Saunders in both their personal and official capacities. But in *Will v. Michigan Department of State Police*, the Supreme Court held that states are not "persons" under § 1983 and thus not amenable to suit.[5] We have held that state universities, as "arms of the state," are not "persons" under § 1983.[6] Additionally, the Court held in *Will* that "a suit against a state official in his or her official capacity . . . is a suit against the official's office," and therefore, "it is no different from a suit against the State itself."[7] Because "neither a State nor its officials acting in their official capacities are 'persons' under § 1983," such suits against a state or a state official acting in his or her official capacity must be dismissed.[8]

Accordingly, neither USM nor Lyman and Saunders, in their official capacities, are persons under § 1983 and the claims for damages against them must be dismissed. Our focus is on Klingler's damage claims against Saunders and Lyman personally[9] and his request for prospective injunctive relief.[10]

## IV

"Section 1983 provides a civil remedy in federal court for violations, under color of state law, of a person's constitutionally recognized rights,

---

[5] 491 U.S. 58, 66-70 (1989).

[6] *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 821 (5th Cir. 2007); *see also Bruner v. Univ. of S. Miss.*, 501 So. 2d 1113, 1115 (Miss. 1987) ("The University of Southern Mississippi is an agency of the State of Mississippi . . . .").

[7] *Will*, 491 U.S. at 71.

[8] *Id.*

[9] *See Hafer v. Melo*, 502 U.S. 21, 31 (1991).

[10] *See Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985).

No. 14-60007

privileges, or immunities."[11]  Klingler alleges Saunders and Lyman deprived him of constitutionally cognizable property and liberty interests without providing him due process as required by the Fourteenth Amendment.

## A

First, we address whether Saunders and Lyman deprived Klingler of a constitutionally protected property interest.  The protections of the Due Process Clause, whether procedural or substantive, only apply to deprivations of constitutionally protected property or liberty interests.[12]  Therefore, if an individual does not have a constitutionally protected property or liberty interest, he or she cannot be deprived of due process and thus cannot maintain a § 1983 action.[13]  Although Klingler had a personal interest in being permitted to satisfy the criteria for tenure, his interest was not constitutionally protected.

"Constitutionally protected property interests are created and defined by understandings that 'stem from an independent source such as state law.'"[14]  While the underlying property interest may be created by state law, *federal constitutional law* determines whether that interest rises to the level" of a

---

[11] *Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006) (citation omitted).

[12] *Whiting v. Univ. of S. Miss.*, 451 F.3d 339, 344 (5th Cir. 2006) ("The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.  Similarly, substantive due process offers protection to an individual only if that person has either a constitutionally protected property interest or a similarly protected liberty interest." (internal quotation marks and citations omitted)).

[13] *See DePree v. Saunders*, 588 F.3d 282, 289 (5th Cir. 2009) ("The threshold requirement of any due process claim is the government's deprivation of a plaintiff's liberty or property interest.  Without such an interest, no right to due process accrues." (internal quotation marks and citations omitted)).

[14] *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

constitutionally protected interest.[15] "Resolution of the federal issue begins, however, with a determination of what it is that state law provides."[16]

Klingler asserts that Saunders and Lyman deprived him of a constitutionally protected property interest in satisfying the criteria for tenure by terminating his employment without affording him the performance reviews from which tenure-track professors achieve tenure as set forth in the Handbook.  Under Mississippi law, non-tenured employees do not have a legitimate expectation of continued employment.[17]  But, their contract rights do constitute enforceable property interests,[18] and "employee manuals become part of the employment contract, creating contract rights to which employers may be held."[19]

In *Whiting v. University of Southern Mississippi*, Dr. Whiting, a tenure-track professor at USM, claimed a deprivation of due process when USM denied her tenure and did not renew her contract.[20]  Whiting had received positive evaluations through her six years of employment and argued she had a constitutionally protected property interest in attaining tenure because the Handbook stated that if she met or exceeded the criteria used for evaluation, "she [was] to be tenured."[21]  But we rejected Whiting's contention because the Handbook "consistently reiterate[d] that promotion and tenure are not guaranteed, even by positive performance reviews," and "tenure is awarded at

---

[15] *Town of Castle Rock, Colo. v. Gonzalez*, 545 U.S. 748, 756-57 (2005) (internal quotation marks and citations omitted).

[16] *Id.* at 757.

[17] *Wicks v. Miss. Valley State Univ.*, 536 So. 2d 20, 23 (Miss. 1988).

[18] *Univ. of Miss. Med. Ctr. v. Hughes*, 765 So. 2d 528, 536 (Miss. 2000).

[19] *Whiting v. Univ. of S. Miss.*, 451 F.3d 339, 345 (5th. Cir. 2006) (citing *Robinson v. Bd. of Trs. of E. Cent. Junior Coll.*, 477 So. 2d 1352, 1353 (Miss. 1985)).

[20] *Id.* at 340-43.

[21] *Id.* at 345.

the discretion of the board of trustees."[22]   We concluded Whiting had no constitutionally protected property interest in continued employment.[23]

Attempting to distinguish his case from *Whiting*, Klingler does not argue he had a right to tenure but argues instead he had a right to satisfy the tenure criteria.  But *Whiting* forecloses this argument as well.  In *Whiting*, we held that Mississippi law and the Handbook do not create a legitimate expectation of attaining tenure, even when the criteria for tenure are satisfied.  It follows, *a fortiori*, that Klingler could have no legitimate expectation in an opportunity to satisfy the tenure criteria.  If Saunders and Lyman afforded Klingler the opportunity to satisfy the tenure criteria, at best, he would find himself in the same position Whiting was in: the decision over his continued employment would be entirely within the discretion of the board, and he would have no legitimate expectation in obtaining tenure.  Therefore, Saunders and Lyman did not deprive Klingler of any constitutionally protected property interest when USM declined to renew his contract.

Klingler also argues Saunders and Lyman deprived him of a constitutionally protected property interest when they relieved him of his teaching assignments and banned him from campus in February 2011.  But in *DePree v. Saunders*, we held that a tenured professor was not deprived of a protected property right when he was removed from teaching and prohibited from entering USM's business school, because his "tenure, salary and title remained intact."[24]   Similarly, Klingler had no property interest in either teaching or in being present on USM's campus.  Because USM paid Klingler his salary and health benefits until his contract expired in May 2012, he was

---

[22] *Id.*

[23] *Id.* at 346.

[24] *DePree v. Saunders*, 588 F.3d 282, 285-86, 289 (5th Cir. 2009).

No. 14-60007

not deprived of a constitutionally protected property interest when he was reassigned to perform research from home.

## B

Klingler claims Saunders and Lyman deprived him of his liberty by denying him a name-clearing hearing after damaging his reputation. While property interests are derived from state law, "[p]rotected liberty interests may arise from two sources—the Due Process Clause itself and the laws of the States."[25]  A liberty interest in one's reputation for the purpose of seeking gainful employment arises from both the Due Process Clause[26] and Mississippi law.[27]  When a public employee is "discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities," he is entitled to notice and an opportunity to be heard.[28]  Regardless of whether the interest arises from state law or the Due Process Clause, federal constitutional law determines what process is due.[29]

---

[25] *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (internal quotation marks and citations omitted).

[26] *Owen v. City of Independence, Mo.*, 445 U.S. 622, 661 (1980) ("Due process requires a hearing on the discharge of a government employee if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination." (internal quotation marks and citation omitted)).

[27] *Hall v. Bd. of Trs. of State Insts. of Higher Learning*, 712 So. 2d 312, 322 (Miss. 1998) ("While the existence of a property interest can be created by state law, either legislatively or judicially, likewise, the existence of a protected liberty interest in an individual's reputation can be created by this Court.  Thus, we create a protected liberty interest in a public employee's reputation . . . .").

[28] *Bellard v. Gautreaux*, 675 F.3d 454, 461 (5th Cir. 2012) (quoting *Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006)).

[29] *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("[O]nce it is determined that the Due Process Clause applies, the question remains what process is due. The answer to that question is not to be found in [state law]." (internal quotation marks and citations omitted)).

No. 14-60007

This court applies a seven-element stigma-plus-infringement test to determine when an individual has been unconstitutionally denied a name-clearing hearing.  The plaintiff must show:

> (1) he was discharged; (2) stigmatizing charges were made against him in connection with the discharge; (3) the charges were false; (4) he was not provided notice or an opportunity to be heard prior to the discharge; (5) the charges were made public; (6) he requested a hearing to clear his name; and (7) the employer denied the request.[30]

Klingler argues that he was entitled to a name-clearing hearing because his reputation was tarnished when he was banned from campus.  Although it is possible Klingler publicized the incident further through his actions while on administrative leave, he argues USM officials made the incident public by utilizing USM police officers to march him across campus to ensure he vacated university premises.  He also has had subsequent difficulty obtaining work elsewhere.  Klingler's formal grievance accused USM of mistreatment and demanded a hearing for the purpose of reinstating his rights as a tenure-track professor and for clearing his name.  Klingler's claim ultimately fails because USM provided him with a constitutionally adequate opportunity to adjudicate his grievance by fully complying with its own comprehensive faculty-grievance procedures.

Chapter 12 of the Handbook provides four levels of institutional review for faculty grievances.  After filing his grievance, Klingler discussed with USM officials the possibility of forgoing the Chapter 12 procedures and adjudicating his grievance through an agreed-upon process before the University Advisory Committee (UAC).  But the parties could not agree on alternative procedures;

---

[30] *Bellard*, 675 F.3d at 462 (quoting *Bledsoe*, 449 F.3d at 653).

USM thus proceeded to adjudicate Klingler's grievance pursuant to Chapter 12.

The first level of Chapter 12 review is a conference between the grievant and the chair of the grievant's specific department. The conference is intended to be an opportunity to resolve the conflict informally. After Klingler and USM could not agree on alternative procedures, USM scheduled a meeting between Klingler and Dr. Melanie Norton, the department chair of SLIS. Klingler refused to attend the meeting. Klingler's counsel wrote to USM that it would be "a waste of time and money to 'confer' when only Dr. Norton will be present, and we regard such an act as harassment in and of itself." Klingler nonetheless submitted a written statement for Norton to review. Norton concluded that "considering [Klingler's] conduct on 11/9/2010 and his conduct after being placed on administrative leave, I find no reason to believe that we could have handled the situation or Dr. Klingler in any other way."

If the grievant is dissatisfied with the result of the informal conference, the dean of the grievant's college convenes the College Advisory Committee (CAC) for a formal review on the record. Klingler appealed Norton's conclusion to the dean of SLIS. The CAC unanimously decided Klingler's grievance had no merit. The CAC specifically addressed the incident for which Klingler sought a name-clearing hearing:

> Regarding the original incident which is alleged to have occurred on November 9, 2010, given the evidence provided this group, we were unable to determine if the incident and subsequent action was sufficient to merit a grievance.
>
> The CAC does find that on more than one occasion, however, Dr. Klingler's behavior has been inappropriate. First, it is never appropriate to reference violence against other individuals, whether or not it is a direct threat, said "in jest," or simply a general statement. Further, on at least two occasions, with evidence from three seemingly unrelated individuals, Dr. Klingler disregarded the instruction from the University while he was on

administrative leave to refrain from contact or interaction with individuals from the University. That he did not follow this directive by the Dean and the Provost shows lack of professional judgment and evidence of insubordination.

Decisions of the CAC can next be appealed to the Provost, who convenes the UAC. The UAC reviews the record and provides a recommendation to the Provost, which the Provost may deviate from in his or her final decision. Klingler appealed the CAC's decision. The UAC determined that Klingler was afforded due process and university procedures were properly followed and thus recommended the Provost take no further action. The Provost then reviewed Klingler's grievance and determined it was without merit.

The final level of institutional review is an appeal of the Provost's decision to the University President. Saunders reviewed Klingler's appeal from the Provost's decision and also determined that his grievance was not meritorious.

Over the course of the four appeals, Klingler's claim that his reputation was unfairly tarnished was repeatedly considered and rejected. The CAC specifically found that Klingler acted inappropriately both on the date of the initiating incident and while he was on administrative leave. USM officials strictly complied with the grievance procedures in the Handbook, and the thoroughness of that review process makes it clear to this court that Klingler was provided a constitutionally sufficient name-clearing hearing, assuming that he was entitled to one. His claim of a deprivation of liberty without due process fails as a matter of law.

### C

Klingler argues the Chapter 12 grievance procedures could not provide him with due process because the individuals tasked with reviewing his grievance were biased against him. Klingler is correct that he was entitled to

a tribunal of unbiased decision makers,[31] however, he is unable to point to any evidence in the record indicating unconstitutional bias.

The members of an adjudicative body have been found to be unconstitutionally biased in three circumstances:

> (1) where the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) where an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) when a judicial or quasi-judicial decision maker has the dual role of investigating and adjudicating disputes and complaints.[32]

Klingler identifies Saunders and Lyman as the biased adjudicators of his grievance.  His claims of bias fall within the second and third categories.

Personal abuse or criticism can render a decision maker unconstitutionally biased when "contemptuous conduct" by the party embroils the judge in "controversy [such] that he cannot hold the balance nice, clear, and true."[33]  Klingler has not made such a showing here.  In his grievance filing, Klingler stated that Saunders and Lyman "secretly banded against [him] and reached erroneous conclusions."  He now argues that this criticism of Saunders and Lyman rendered them unconstitutionally biased to adjudicate his grievances.  But, without more, this is not the type of personal abuse or criticism that has been recognized to create unconstitutional bias.[34]  There is

---

[31] *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 511 (5th Cir. 2001) (citing *In re Murchison*, 349 U.S. 133, 136 (1955)).

[32] *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1052 (5th Cir. 1997) (citation omitted).

[33] *Taylor v. Hayes*, 418 U.S. 488, 501 (1974) (internal quotation marks and citations omitted).

[34] *See, e.g.*, *Farmer v. Strickland*, 652 F.2d 427, 438-39 (5th Cir. Unit B 1981) (holding a judge was not unconstitutionally biased to find lawyer in contempt after a heated exchange during voir dire).

no evidence in the record that Klingler's criticism embroiled Saunders and Lyman such that they could not act as unbiased adjudicators.

The main thrust of Klingler's claim of bias is that Saunders and Lyman "convicted" him prior to terminating his employment and adjudicating his grievance.  When a quasi-judicial decision maker serves a dual role of both investigating and adjudicating disputes, a constitutional infirmity exists only if the decision maker's mind was "irrevocably closed" prior to the adjudication.[35]  The party complaining of bias must also overcome strong presumptions of (1) the adjudicators' honesty and integrity and (2) that the decision was made in the public interest.[36]  We have further recognized in academic contexts that "a due process hearing is not rendered constitutionally inadequate solely because university administrators are asked to review their own decisions."[37]  There is no evidence in the record indicating Saunders's and Lyman's minds were irrevocably closed, nor is there evidence that overcomes the strong presumptions regarding Saunders' and Lyman's honesty and integrity and that their decisions were made in the public interest.  Saunders and Lyman are entitled to summary judgment on Klingler's claims of bias.

**D**

Klingler also claims Saunders and Lyman violated his right to equal protection because his employment was terminated while USM's athletic director remains employed despite exhibiting "violent behavior."  While equal protection cases typically concern governmental classifications that impact

---

[35] *Valley*, 118 F.3d at 1052.

[36] *Id.* at 1052-53.

[37] *Tex. Faculty Ass'n v. Univ. of Tex. at Dall.*, 946 F.2d 379, 388 (5th Cir. 1991); *see also Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 497 (1976) ("A showing that the Board was 'involved' in the events preceding this decision . . . is not enough to overcome the presumption of honesty and integrity in policy makers with decisionmaking power.").

groups of citizens in different ways,[38] the Supreme Court has recognized a "class-of-one" equal protection claim when an individual has "been intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment."[39]  But, class-of-one claims do not apply in the context of public employment because "employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify."[40]  Because Klingler attempts to assert a "class-of-one" claim in the context of public employment, his claim fails as a matter of law.

## V

With respect to Klingler's claims under Mississippi contract and tort law, Klingler appears to have accepted the district court's determination that his claims for breach of an implied contract and negligent infliction of emotional distress are barred by the Mississippi Tort Claims act since he asks us to remand for trial only his claims of breach of an express contract and intentional infliction of emotional distress.  There is insufficient evidence in the record, however, to support either cause of action.

## A

Under Mississippi law, the elements of a breach-of-contract claim are: (1) the existence of a valid and binding contract and (2) the defendant's breach of that contract.[41]  While employee handbooks can create obligations on

---

[38] *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008).

[39] *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

[40] *Engquist*, 553 U.S. at 603-05 ("[T]he class-of-one theory of equal protection—which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review—is simply a poor fit in the public employment context.").

[41] *See Bus. Commc'ns, Inc. v. Banks*, 90 So. 3d 1221, 1224-25 (Miss. 2012) (holding that monetary damages are a remedy, not an element of a breach-of-contract claim).

employers that become "part of the contract,"[42] employers can prevent the handbooks from imposing contractual obligations by merely including a disclaimer of contractual rights.[43]

Klingler argues USM breached his employment contract by not giving him the opportunity to satisfy the criteria for tenure and by not following the grievance procedures outlined in Chapter 12. Both of these contractual "rights" stem from the Handbook, not Klingler's employment contract. But, the Handbook expressly provides that its "policies are intended only to be guidelines for employment at USM, and they do not give rise to any contractual rights." Therefore, under Mississippi law, USM was not contractually obligated to follow the procedures set forth in the Handbook. In any event, as discussed above, USM did comply with the procedures set forth in Chapter 12. Klingler's breach of contract claim fails as a matter of law.

## B

A plaintiff can recover for emotional distress in the absence of physical injury in Mississippi "when the defendant's conduct evokes outrage or revulsion."[44] A plaintiff must show that the defendant "intentionally and maliciously" sought to do him or her harm.[45] Additionally, claims "for intentional infliction of emotional distress will not ordinarily lie for mere employment disputes"[46] and "[o]nly in the most unusual cases does the conduct

---

[42] *Bobbitt v. Orchard, Ltd.*, 603 So. 2d 356, 361 (Miss. 1992).

[43] *Lee v. Golden Triangle Planning & Dev. Dist., Inc.*, 797 So. 2d 845, 848 (Miss. 2001); *see also Byrd v. Imperial Palace of Miss.*, 807 So. 2d 433, 438 (Miss. 2001) ("[W]e uphold Imperial's right to discharge Byrd, even in light of the grievance procedure, because of the handbook's statement that Imperial did not intend to waive its right to unilaterally terminate an employee by promulgating the handbook.").

[44] *Gamble ex rel. Gamble v. Dollar Gen. Corp.*, 852 So. 2d 5, 11 (Miss. 2003).

[45] *Morgan v. Greenwaldt*, 786 So. 2d 1037, 1044 (Miss. 2001).

[46] *Lee*, 797 So. 2d at 851.

16

move out of the realm of an ordinary employment dispute into the classification of extreme and outrageous, as required for the tort of intentional infliction of emotional distress."[47]

Klingler has alleged no conduct by USM or its officials that would evoke outrage or revulsion or that would indicate they acted intentionally or maliciously toward him.  Klingler's claim of intentional infliction of emotional distress fails as a matter of law.

*     *     *

For the foregoing reasons, the decision of the district court granting summary judgment to USM, Saunders, and Lyman on all of Klingler's claims is AFFIRMED.

---

[47] *Brown v. Inter-City Fed. Bank for Sav.*, 738 So. 2d 262, 265 (Miss. 1999) (internal quotation marks and citations omitted).